IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| LENOVO PC HK LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>MAXIM INTEGRATED PRODUCTS, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>) C.A. No. _____<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

Plaintiff Lenovo PC HK Limited ("Lenovo"), for its complaint against Defendant Maxim Integrated Products, Inc. ("Maxim"), alleges as follows:

## INTRODUCTION

1. Plaintiff Lenovo seeks to recover from Maxim the millions of dollars in damages that it sustained as a result of Maxim's breaches of its contractual obligations to supply Lenovo with certain defect-free chips and reimburse Lenovo for certain chip defects and failures.

2. In June 2008, Lenovo's predecessor-in-interest, Lenovo Singapore PTE Ltd. ("Lenovo Singapore"),[1] and Maxim's predecessor-in-interest, Volterra Semiconductor Corporation ("Volterra") entered into a Component Agreement under which Volterra agreed to supply Lenovo Singapore with certain defect-free hardware, software and other parts. A copy of the Component Agreement is attached hereto as **Exhibit A**.

3. On or around October 1, 2013, Maxim acquired Volterra. At that time, Volterra assigned its rights and obligations under the agreement with Lenovo Singapore to Maxim.

---

[1] Because Lenovo Singapore assigned all of its rights and obligations to Lenovo and Lenovo became a successor-in-interest to Lenovo Singapore's rights and obligations under the agreements with Maxim, this complaint refers to the two entities collectively as "Lenovo" except where the distinction is relevant or necessary.

Sometime thereafter, Lenovo Singapore assigned its rights and obligations under the agreement with Volterra to Lenovo.

4. Effective December 4, 2015, the parties executed Amendment No. 1 to the Component Agreement (the "Amendment" or together with the Component Agreement, the "Agreement"). The Amendment modified several provisions of the Component Agreement, including the Epidemic Defect Provision. The Amendment governs all products purchased by Lenovo from October 1, 2014. A copy of Amendment No. 1 to the Component Agreement is attached hereto as **Exhibit B**.

5. Pursuant to the Agreement, Lenovo purchased, among other products, VT1677 chips ("VT1677 chips") from Maxim. The VT1677 chips were purchased for incorporation into Lenovo planar boards. Each planar board is comprised of eight VT1677 chips. Since 2014, Lenovo purchased over five million VT1677 chips from Maxim for incorporation into Lenovo planar boards.

6. A planar board provides connections between electrical components in a computer system. Chips are flat pieces of semiconductor material that are embedded into planar boards to amplify and control electrical signals and electrical power.

7. Under the terms of the Agreement, Maxim warranted that all products, including the VT1677 chips, it supplied Lenovo and its affiliates would be free from defect in design and defect in materials and workmanship. (Exhibit A, Section 2.0.)

8. Maxim violated the Parties' Agreement by supplying Lenovo with numerous faulty VT1677 chips. The faulty chips caused server system failures at several Lenovo customer sites, significantly damaging Lenovo's relationships with these entities.

9. Following the multiple server failures, Lenovo timely notified Maxim of the defects in the VT1677 chips. Lenovo then issued a stop ship order on the machine types that experienced server system failure and demanded that Maxim investigate the root cause of its chip failures.

10. Prior to the failures and in response to electrical overstress issues with Maxim VT1677 products, Maxim implemented Avalanche (AV) testing on all Maxim Products supplied to Lenovo. The AV testing was initiated to capture defective products before they were sent to Lenovo. When Maxim implemented the AV testing, Lenovo consented to the test procedure. Subsequently, Maxim changed the AV test procedure without Lenovo's input or consent. Specifically, Maxim modified the AV test procedure by doubling the number of energy frequency pulses directed toward each VT1677 chip. This change in the testing procedure made the VT1677 more susceptible to passivation cracking, and therefore chip failure.

11. Following its investigation of the VT1677 chip failures, Maxim admitted that certain VT1677 chips were defective and at-risk, and conceded that the defect was attributable to the recent change in the VT1677 AV test procedure.

12. Maxim identified eight date codes as being at-risk. Maxim informed Lenovo that Maxim itself defined any product that experienced passivation crack failure at a rate higher than forty-percent (40%) as being "high risk." Any other product that Maxim identified as having a risk of passivation crack failure was defined "low risk" by Maxim.

13. Lenovo subsequently determined that over 15,000 machines contained high risk VT1677 chips and over 29,000 machines contained low risk chips. Lenovo immediately engaged Wistron Corporation to complete reliability testing and establish a rework method. In light of the serious performance and safety risk, potential for millions of dollars in damage to Lenovo and customer equipment, and the cost of identifying and replacing at-risk chips, Lenovo was forced to

replace thousands of high-risk identified chips. Rework of these planar boards was not commercially reasonable given these costs and the probability of additional failure.

14. The faulty VT1677 chips are an "Epidemic Defect," as that term is defined in the Agreement. (Exhibit B, Section 1.0). As a result, Maxim was and is required to reimburse Lenovo and its affiliates for the actual and reasonable costs they sustained to correct problems arising from the defective product.

15. Lenovo timely sought reimbursement of costs and damages it sustained as a result of the defective VT1677 chips.

16. Despite admitting that certain VT1677 chips it supplied Lenovo were defective or at-risk, Maxim has refused to reimburse Lenovo the amounts due and owing under the Agreement, wrongly asserting that Lenovo inflated its damages and incorrectly calculated the product failure rate, as those terms are defined in the Agreement. Maxim contends that only actual and confirmed defective products can be used to calculate the Epidemic Defect rate. Maxim's reading of the Agreement is contrary to the plain language of the contract. The Agreement is clear that any product replaced "due to the same or similar defect" is included in the Epidemic Defect rate.

17. Lenovo has expended millions of dollars to remedy problems arising from the defective VT1677 chips. Abandoning its obligations to Lenovo, Maxim has refused to pay millions of dollars in costs owed to Lenovo. This is exactly the outcome that the Agreement was designed to prevent.

18. Maxim has breached its obligations under the Agreement's Epidemic Defect and Remedies provisions to reimburse Lenovo for damages and costs associated with and arising from the defective VT1677 chips. Maxim's breaches have damaged Lenovo and its reputation worldwide. As a result of Maxim's breaches, Lenovo is entitled to the actual and reasonable costs

it incurred as a result of the Epidemic Defect, as well as costs, fees, and expenses, including reasonable attorneys' fees, to the fullest extent allowed by law.

## PARTIES

19. Plaintiff Lenovo PC HK Limited is a Hong Kong corporation with its principal place of business in Hong Kong. Lenovo PC HK Limited is registered to do business in Delaware.

20. On information and belief Defendant Maxim Integrated Products, Inc. is a Delaware corporation with its principal place of business in San Jose, California.

## JURISDICTION AND VENUE

21. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000. The Court also has subject matter jurisdiction pursuant to 28 U.S.C. §§ 2201 and 2202.

22. Maxim has consented to personal jurisdiction and venue in this Court under Section 8.3 of the Component Agreement.

## FACTS

**I.  Lenovo and Maxim Establish a Procurement Relationship.**

23. On or about June 23, 2008, Lenovo Singapore and Volterra entered into a Component Agreement (the "Component Agreement," or together with the Amendment, the "Agreement"), establishing a procurement relationship under which Volterra would supply Lenovo Singapore and its affiliates with certain "hardware, software, and other parts." (Exhibit A, Section 1.0).

24. Volterra expressly warranted that any product it supplied Lenovo Singapore, would be (1) "free from defects in design"; (2) "free from defects in materials and workmanship"; and (3) "safe for their intended use." (*Id.* at Section 2.0).

25. The Component Agreement set forth a minimum standard for construing products and services as defective by defining "Epidemic Defects" as follows:

> **"Epidemic Defects"** means Products that breach any of the warranties specified in Section 2.0.1, 2.0.2, or 2.0.1 that experience one or more of the following: (a) by part number, a one-half percent (0.5%) per month replacement rate in two (2) consecutive months, for the total population shipped in any, or all, Lenovo machine type(s), due to the same or similar defect (i.e. same root cause); (b) by part number, a one half percent (0.5%) per month replacement rate in two (2) consecutive months, for the total population of options shipped, due to the similar or similar defect (i.e. same root cause); (c) by part number, a one-half percent (0.5%) preplacement rate in two (2) consecutive months, for the population shipped in Lenovo systems during any given calendar month, due to the same or similar defect (i.e. same root cause); or (d) one or more safety concerns created by the Products.

(Exhibit A, Section 1.0). Under this provision, a small fraction of defective products could establish an Epidemic Defect.

26. In the event of an Epidemic Defect, the Agreement required the Parties to "cooperate in establishing and implementing a "Corrective Action Plan". The Corrective Action Plan shall encompass (i) identification and implementation plans for engineering changes to eliminate all root cause defect(s) in Products not yet shipped, (ii) disposition of work in process and unshipped finished products, (iii) identification of Affected Product in the field, (iv) procedures for the return testing, repair, or replacement of such Affected Product, and (v) the Parties' respective roles in implementing the Corrective Action Plan." (*Id.* at Section 4.0).

27. About October 1, 2013, Maxim acquired Volterra. At that time, Volterra assigned its rights and obligations under the agreement with Lenovo Singapore to Maxim. Sometime

thereafter, and as allowed by Section 8.2 of the Component Agreement, Lenovo Singapore assigned its rights and obligations under the Agreement to Lenovo.

28.     Effective December 4, 2015, the parties executed the Amendment to the Component Agreement. The Amendment modified several provisions of the Component Agreement, including the Epidemic Defect Provision. The Amendment governs all products purchased by Lenovo from October 1, 2014.

29.     The Amendment specifically "deleted in its entirety" the Component Agreement's definition of "Epidemic Defects" and replaced it with the following:

> **"Epidemic Defects"** means Products that experience one or more of the following: (a) by part number, a one-half percent (0.5%) per month replacement rate in two (2) consecutive months, for the total population shipped in any, or all, Lenovo machine type(s), due to the same or similar defect (b) by part number, a one half percent (0.5%) per month replacement rate in two (2) consecutive months, for the total population of options shipped, due to the similar or similar defect (c) by part number, a one-half percent (0.5%) preplacement rate in two (2) consecutive months, for the population shipped in Lenovo systems during any given calendar month, due to the same or similar defect; (d) one or more safety concerns when used in accordance with the operating parameters in the specification for such Products; or (e) failure of the Product to meet its specifications or to otherwise satisfy a material term of this Agreement such that Buyer's marketing and sale of products incorporating such Products will result in an Epidemic Defect incident as defined in (a), (b), (c), or (d) above.

(Exhibit B, Section 1.0).

30.     The Amendment also modified the Remedies provision to include the following language:

> Notwithstanding anything to the contrary in this Agreement, in the event of an Epidemic Defect, Supplier shall, at Lenovo's request, and at Supplier's expense, (i) sort, screen repair, and/or replace Products held by Purchasers, Lenovo, Lenovo's Affiliates, Lenovo's customers, distributors, and service providers; and/or (ii) accept the return of affected Products for a full refund, regardless of

> whether the Products are individually determined to be defective at the time of their return, with the refund for each Product returned equal to the greater of (a) the actual Price paid for the Product, or (b) the latest approved Price for the Product (or in the case of technological obsolesce of the purchased Product, the latest approved Price for the Product now offered by Lenovo); and/or (iii) reimburse Purchasers, Lenovo and Lenovo's Affiliates for the actual and reasonable costs incurred in connection with the recall or other corrective action, including without limitation, Lenovo's costs in retaining third parties to perform some or all of these responsibilities.

(*Id.* at Section 4.0).

31. Under the terms of the Agreement, the Parties specifically agreed that within the United Sates, the laws of the State of Delaware would govern any disputes arising out of or based upon the Agreement. The parties also agreed that any action related to breach of the Agreement would be commenced "in a state or federal court of the State of Delaware, if any part of the transaction is performed in the United States." (Exhibit A, Section 8.3). Upon information and belief, Maxim executed the Amendment in the United States.

## II.  Maxim Supplies Lenovo With Defective VT1677 Chips.

32. In August 2017, Lenovo received notification of widespread server system failure at several of its customers in China. Approximately 115 systems were returned by customers to Lenovo as a result of those failures.

33. Following notification of the server failures, Lenovo issued a stop ship order, halting shipment of machine types experiencing failure. Lenovo arranged a system control build to determine if the server system failures were caused by a component issue. Upon completion, Lenovo concluded that the server system failures were caused by a component issue with Maxim chip products which were incorporated into Lenovo planar boards. Each planar board contains

eight chips. Problems with Maxim's chips caused the planar boards to fail which in turn caused the server systems to fail.

34. Lenovo then engaged with Maxim to determine the root cause of the faulty chips. Lenovo conducted power cycle testing on all of its Xinyi and Daan planar boxes to ascertain which chips supplied by Maxim were affected by the defect.

35. Maxim admitted that VT1677 chips with date codes ranging from 1650 to 1720 were defective and at-risk. Maxim attributed the defect to a recent VT1677 avalanche (AV) sort program change.

36. Following further inspection, Maxim identified eight lot codes of the risk-identified date codes as being high risk. Maxim informed Lenovo that Maxim itself defined any product that experienced passivation crack failure at a rate higher than forty-percent (40%) as being "high risk." Any other product that Maxim identified as having a risk of passivation crack failure was defined "low risk" by Maxim. Lenovo sorted all planar boards built containing the risk-identified chips and completed additional power cycle testing.

37. Lenovo immediately began sorting its inventory to isolate those servers containing product Maxim defined as at-risk. Lenovo subsequently determined that over 15,000 machines contained "high risk" VT1677 chips, as defined by Maxim, and over 29,000 machines contained "low risk" chips, as defined by Maxim. Lenovo placed holds on all servers containing the product affected by the defect.

38. Beginning in September 2017, Lenovo engaged with Wistron Corporation ("Wistron") to complete reliability testing and establish a rework method. Wistron and Lenovo estimated that reworking the affected planar boards containing an at-risk chip was both cost

9

prohibitive and contrary to industry practice, and would further damage the boards, thereby reducing their reliability and increasing the probability of additional failure.

39. Lenovo informed Maxim of Wistron's estimated costs. In response, Maxim told Lenovo that it was Lenovo's decision how to proceed with the board repair issue, as Lenovo knows its business and customer requirements best.

40. As a risk mitigation plan and following communication with Maxim about Wistron's estimated costs, in the January 2018 timeframe, Lenovo manufacturing decided to add a 100x power cycle test to all planars with the "at-risk" components (as identified by Maxim) before these were shipped to customers. Lenovo could not meet customer demand without using these parts.

41. Upon consideration and review of Wistron's cost calculations, Maxim's admissions that its chips were defective, the potential for millions of dollars in damage to Lenovo and Lenovo customer equipment, and other information then available, Lenovo replaced all planar boards containing the Maxim high-risk-identified VT1677 chips for those customers that Lenovo identified as experiencing a critical business need. Each planar board containing the high-risk-identified chips included eight MaximVT1677 chips. Reworking the planar boards containing the high-risk-identified chips was not a commercially reasonable or feasible option. To mitigate its damages, however, Lenovo repaired and reworked all other planar boards containing the Maxim high-risk or low-risk chips.

42. Up to and through February 2018, Lenovo was forced to replace hundreds of planar boards containing defective VT1677 chips. To date, Lenovo has resolved 19 critical customer situations and replaced over 900 planar boards containing defective or at-risk VT1677 chips. In

addition, as a result of the Maxim chip failures, Lenovo has lost revenue on approximately 115 systems that were rejected by customers and returned to Lenovo.

**III.     Maxim Refuses to Reimburse Amounts Due and Owing to Lenovo Under the Agreement.**

43. Maxim's supply of faulty VT1677 chips constitutes an Epidemic Defect under the Agreement, as amended, and exposed Lenovo to significant damages. (Exhibit B, Section 1.0).

44. As required by the Agreement, in the event of an Epidemic Defect, Maxim was required to reimburse Lenovo and its affiliates for the actual and reasonable costs they sustained to correct problems arising from the defective product.

45. The Agreement provides that the Epidemic Defect rate includes any product, by part number, that was replaced "due to the same or similar defect."

46. Each and every replaced chip is a product replaced "due to the same or similar defect."

47. To date, Maxim has refused to reimburse Lenovo for damages it has sustained as a result of the defective VT1677 chips, including but not limited to costs to replace damaged hardware, the costs of unused and defective inventory, as well as manufacturing and rework costs.

48. Maxim's failure to reimburse Lenovo for amounts it expended in connection with the defective VT1677 chips is a breach of the Agreement. Maxim's failure of performance was neither authorized nor sanctioned by Lenovo.

49. At all relevant times, Lenovo has performed its obligations to Maxim under the Agreement and Amendment and has not materially breached the terms thereof.

## FIRST CAUSE OF ACTION

### (Breach of the Component Agreement, as amended)

50. Lenovo repeats and realleges each of the allegations set forth above, as if fully realleged here.

51. The Agreement is a valid, binding, and enforceable contract.

52. Maxim is a party to, and bound by, the terms and provisions of the Agreement.

53. Lenovo has complied in all material respects with its obligations under the Agreement.

54. Pursuant to the Agreement, any products Maxim supplies to Lenovo must be "free from defect in design", "free from defects in materials and workmanship for twenty-four (24) months from the date of delivery," and "safe for their intended use and reasonably foreseeable misuse". (Exhibit A, Section 2.0(1)-(3)).

55. The Agreement defines Epidemic Defect as any product that experiences, or is subject to, one or more of the following:

 a. "[B]y part number, a one-half percent (0.5%) per month replacement rate in two (2) consecutive months, for the total population shipped in any, or all, Lenovo machine type(s), due to the same or similar defect;"

 b. "[B]y part number, a one half percent (0.5%) per month replacement rate in two (2) consecutive months, for the total population of options shipped, due to the same similar defect;"

 c. "[B]y part number, a one-half percent (0.5%) per month replacement rate in two (2) consecutive months, for the population shipped in Lenovo systems during any given calendar month, due to the same or similar defect;"

  d. "[O]ne or more safety concerns when used in accordance with the operating parameters in the specification for such Products;" or

  e. "[F]ailure of the Product to meet its specifications or to otherwise satisfy a material term of this Agreement such that Buyer's marketing and sale of products incorporating such Products will result in an Epidemic Defect incident as defined in (a), (b), (c), or (d) above."

56. Maxim's supply of faulty VT1677 chips qualifies as an Epidemic Defect for at least three reasons:

  a. By part number, the replacement rates for the Maxim VT1677 chips in two consecutive months for the population shipped in Lenovo systems in any given calendar month due to the same or similar defect exceeded one-half percent (0.5%) per month. Specifically, the population of Lenovo systems shipped in July 2017 totaled 7,839. Of the 7,839 shipped, Lenovo replaced 72 planar boards affected by the VT1677 chip failure, yielding a replacement rate of .92%. The population of Lenovo systems shipped in August 2017 totaled 8,275. Of the 8,275 shipped, Lenovo replaced 533 planar boards affected by the VT1677 chip failure, yielding a replacement rate of 6.44%.

  b. By part number the replacement rate for the Maxim VT1677 chips in two consecutive months for the total population shipped in any, or all, Lenovo machine types due to the same or similar defect, exceeded one-half percent (0.5%) per month. Specifically, the population of planar boards in Lenovo Machine Type 8869 that were shipped in July 2017 totaled 3,516. Of the

       3,516 shipped, Lenovo replaced 41 planar boards affected by the VT1677 chip failure, yielding a replacement rate of 1.17%. The population of planar boards in Lenovo Machine Type 8869 shipped in August 2017 totaled 3,375. Of the 3,375 shipped, Lenovo replaced 167 planar boards affected by the VT1677 chip failure, yielding a replacement rate of 4.95%.

  c. The Maxim VT1677 chips failed to meet product specifications or otherwise satisfy a material term of the Agreement, as amended, such that Lenovo's marketing and sale of products incorporating the VT1677 chips would have resulted in an Epidemic Defect under the Agreement.

57. In the event of an Epidemic Defect, the Agreement requires Maxim to, in relevant part, "accept the return of affected Products for a full refund, regardless of whether the Products are individually determined to be defective at the time of their return," and reimburse Lenovo for the actual and reasonable costs it and its affiliates incurred to remedy the Epidemic Defect.

58. Lenovo timely sought refund and reimbursement of the damages it sustained as a result of the defective VT1677 chips, including but not limited to the costs it and its affiliates incurred to replace damaged hardware and software, manufacturing costs, supplier costs, field failure costs, and labor and travel costs associated with reworking and replacing the defective VT1677 chips.

59. To date, Maxim has failed to reimburse Lenovo for any of the damages it sustained as a result of the defective VT1677 chips.

60. Maxim has materially breached its contractual obligations to Lenovo under the Agreement, as amended, by failing to reimburse Lenovo for these costs and damages.

61. As a direct and proximate result of Maxim's material breach, Lenovo has been damaged in an amount to be determined at trial, but currently believed to be about three million dollars, plus interest accrued to date? and accruing thereafter, along with Lenovo's attorneys' fees and other expenses incurred in enforcing its rights to these amounts.

## SECOND CAUSE OF ACTION

**(Breach of Implied Warranty of Merchantability – Delaware Code § 2-314)**

62. Lenovo realleges and incorporates by reference the allegations set forth in paragraphs1 through 61 above, as if fully realleged here.

63. The faulty VT1677 chips supplied by Maxim are goods as defined under Delaware Code § 2-105.

64. Pursuant to Delaware Code § 2-104, Maxim is a merchant who deals in VT1677 chips.

65. At the time Maxim supplied the faulty VT1677 chips to Lenovo, Maxim knew the use for which the chips was intended, and impliedly warranted the products to be of merchantable quality as defined by Delaware Code § 2-314.

66. Lenovo reasonably relied on Maxim's skill and judgment as to whether the VT1677 chips were of merchantable quality.

67. Contrary to Maxim's implied warranties, the VT1677 chips supplied to Lenovo were not of merchantable quality.

68. Maxim's failure to supply Lenovo with chips of merchantable quality is a breach of its implied warranty of merchantability under Delaware Code § 2-314.

69. As a direct and proximate result of Maxim's breach of implied warranties regarding the quality and effectiveness of its products, Lenovo has sustained damages totaling almost three million dollars.

## THIRD CAUSE OF ACTION

**(Breach of Implied Warranty of Fitness for a Particular Purpose – Delaware Code § 2-315)**

70. Lenovo realleges and incorporates by reference the allegations set forth in paragraphs 1 through 69 above, as if fully realleged here.

71. Upon information and belief, at the time Maxim agreed to supply the VT1677 chips to Lenovo, Maxim knew the particular use for which the products were required, and impliedly warranted that the chips were reasonably fit for such purpose.

72. Lenovo reasonably relied upon Maxim's skill and judgment as to whether the chips were fit for such purpose.

73. Contrary to Maxim's implied warranties, the VT1677 chips supplied to Lenovo were not fit for their anticipated or reasonably foreseeable use.

74. Maxim's failure to supply Lenovo with defect-free VT1677 chips is a breach of its implied warranty of fitness for a particular purpose under Delaware Code § 2-315.

75. As a direct and proximate result of Maxim's breach of implied warranties regarding the quality and effectiveness of its products, Lenovo has sustained damages totaling almost three million dollars.

**PRAYER FOR RELIEF**

WHEREFORE, Lenovo respectfully requests that this Court enter judgment in favor of Lenovo:

A. On the first cause of action for breach of the Component Agreement, as amended, finding against Maxim in an amount to be determined at trial, but approximately $3,000,000.00;

B. On the second cause of action for breach of implied warranty of merchantability, finding against Maxim in an amount to be determined at trial;

C. On the third cause of action for breach of implied warranty of fitness for a particular use, finding against Maxim in an amount to be determined at trial;

D. Awarding Lenovo its attorneys' fees and any and all other fees and expenses incurred in bringing this action;

E. Awarding Lenovo prejudgment interest at the maximum legal rates allowed by law; and

F. Such other and further relief as this Court may deem just and proper.

| | |
|---|---|
| Dated: November 1, 2021<br>Wilmington, Delaware | **WOMBLE BOND DICKINSON (US) LLP**<br><br>*/s/ Kevin J. Mangan*<br>Kevin J. Mangan (#3810)<br>Nicholas T. Verna (#6082)<br>1313 North Market Street, Suite 1200<br>Wilmington, Delaware 19801<br>Telephone: (302) 252-4320<br>Facsmile: (302) 252-4321<br>Email: kevin.mangan@wbd-us.com<br>Email: nick.verna@wbd-us.com<br><br>Hayden J. Silver, III (*pro hac vice* to be filed)<br>Raymond M. Bennett (*pro hac vice* to be filed)<br>Madison B. Waller (*pro hac vice* to be filed)<br>555 Fayetteville Street, Suite 1100<br>Raleigh, North Carolina 27601<br>Telephone: (919) 755-2100<br>Facsmile: (919) 755-2150<br>Email: jay.silver@wbd-us.com<br>Email: ray.bennett@wbd-us.com<br>Email: madison.waller@wbd-us.com<br><br>*Attorneys for Plaintiff Lenovo PC HK Limited* |